IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| 1ST AMENDMENT PRAETORIAN | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-00060 |
| | ) | |
| | ) | **TRIAL BY JURY** |
| DENVER LEE RIGGLEMAN, III, | ) | **IS DEMANDED** |
| HEARST MAGAZINE MEDIA, INC. | ) | |
| HENRY HOLT & COMPANY, INC., | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| MACMILLAN PUB. GROUP., LLC | ) | |
| | ) | |
| Defendant. | ) | |

# **COMPLAINT**

Plaintiff, 1st Amendment Praetorian ("1AP"), by counsel, pursuant to Rule 3 of the Federal Rules of Civil Procedure (the "Rules"), files the following Complaint against Defendants, Denver Lee Riggleman, III ("Riggleman"), Hearst Magazine Media, Inc. ("Hearst"), Henry Holt & Company, Inc. ("Holt") and Macmillan Publishing Group, LLC ("Macmillan"), jointly and severally.

1AP seeks (a) compensatory and punitive damages in the sum of **$50,350,000.00**, (b) prejudgment interest on the principal sum awarded by the Jury from September 27, 2022 to the date Judgment is entered pursuant to § 8.01-382 of the Virginia Code (1950), as amended (the "Code"), (c) a permanent injunction, and (d) court costs – arising out of the Defendants' defamation and insulting words.

## I.  STATEMENT OF MATERIAL FACTS

1.      Robert Patrick Lewis ("Lewis") is a decorated United States Army Green Beret, who received a Bronze Star and Purple Heart in the service of his Country.  He possessed a TS-SCI security clearance and received an Honorable Discharge.  In 2020, Lewis founded 1AP to provide pro bono security and protective services at grassroots events.  Lewis created 1AP to ensure that every American can freely associate, freely gather and freely speak on matters of public concern to them without threat or fear of intimidation, retribution, bodily harm or death. [https://1apraetorian.com/].

2.      January 6, 2021 was one of the most dangerous days in the modern history of our republic.  On that day, 1AP provided security detail for members of the press, including an ABC affiliate.

3.      Neither 1AP, Lewis, nor any of 1AP's security professionals engaged in violence or played any part in the attack on the United States Capitol on January 6, 2021.  Prior to publication of the false statements and defamatory implications at issue in this case, Defendants knew that 1AP had been thoroughly investigated by the Federal Bureau of Investigations ("FBI") and cleared of any wrongdoing.  Defendants knew the truth, but published egregious lies.

4.      On September 27, 2022, Hearst published in its *Esquire* magazine an edited excerpt from a book written by Riggleman and Hunter Walker ("Walker") and published by Holt and MacMillan called "*The Breach: The Untold Story of the Investigation Into January 6*" (the "*Breach*").  Hearst titled the edited excerpt, "***Six Teams and 'The Monster': The Inner Workings of the January 6 Committee's Investigation***".  [https://www.esquire.com/news-politics/a41396235/the-breach-denver-

riggleman-jan-6-excerpt/ (the "Riggleman Piece")].   The *Breach* and the Riggleman

Piece contain false statements, defamatory implications and insulting words of or

concerning 1AP, including:

- "The select committee [to Investigate the January 6 Attack on the United States Capitol (the "J6 Committee")] had six teams working separately. They were all code-named with different colors: Red, Gold, Green, Purple, Orange, and Blue … Red focused on the rioters and what we termed 'day-of command and control,' in other words, coordination among people who engaged in violence at the Capitol on January 6th.   This included the activists and conspiracists who planned the Stop the Steal and 'Save America' protests that drew people to DC that day.   The militant groups that took part in the attack, namely the Proud Boys, Oath Keepers, and 1st Amendment Praetorian, were also part of this portfolio.   The committee was looking at the storming of the building as a military operation."

- "The Red Team handed my telephone team their heaviest workload.   We matched names to numbers – and vice versa.   We also helped them track the connections among the various violent extremist groups.   We found plenty.   Both my telephony and OSINT analysts prepared files on people the committee investigators were set to interview."

- "My OSINT team drafted deep-dive dossiers on all these major players."

- "The Purple Team studied the radicalization pipeline.   We didn't only want to know what people did when they charged at the Capitol on January 6th.   We wanted to know how they got there and who sent them. Purple Team researched the activity of extremist groups and MAGA influencers in the months leading up to the attack."

- "We called the main link map 'The Monster.'   The targets of our investigation were divided up into five major categories: domestic violent extremists, which included militant groups like Proud Boys, Oath Keepers, and 1st Amendment Praetorian; rally organizers; officials, which included members of Congress and local politicians; Trump associates, which included top advisers and staff; and the president's family. We also tracked a sixth group of unaffiliated individuals, who were mainly people we identified because they faced federal charges for breaking into the Capitol … The telephony team's maps were made up of link lines.   Each line represented an incoming or outgoing communication from a call detail record … Zooming out, the 'Monster' looked like a lopsided hexagon with six major connected hubs representing each of our five categories and the unaffiliated rioters."

● "They were all connected.  Everyone was linked."

(Each a "Statement" and together the "Statements").

5.      Viewed in context and read as a whole, the intended and endorsed meaning and defamatory gist of the Statements is that 1AP participated in the attack on the United States Capitol on January 6, 2021 and otherwise engaged in coordinated acts of "domestic terrorism".  The cover of the *Breach* – prominently displayed over a Getty image of rioters selected and used by Hearst editors to introduce the Riggleman Piece and endorse its meaning – describes the book as the "untold" story of the "investigation into January 6th".  In the book, Riggleman clarifies that the J6 Committee's "investigation" is a "domestic terrorism investigation."  "Investigating domestic terrorism isn't a time for being shy," notes Riggleman.  According to Riggleman, the *Breach* is the story of "what happened" on January 6, 2021, "and who was behind it."  The inside jacket cover of the *Breach* states that the book "lays out the full intent and scope of the plot".  In the *Breach*, Riggleman further represents that the book constitutes the "who, how and why" of January 6 based on "concrete proof and data".  Riggleman claims that he "knew how the [J6] committee could obtain intelligence on the individuals involved in the events of January 6th."  Riggleman asserts that he and his teams of "analysts" used open-source intelligence (OSINT)[1] and so-called "WEBINT" (*i.e.* Google searches) to follow the "radicals who sought to overturn the election for President Trump".  Riggleman told J6 Committee member Wyoming Representative (former) Elizabeth Cheney ("Cheney") that he and shadowy organizations with whom he worked, including the Network Contagion

---

[1]      According to Riggleman, OSINT "means the aggregation and analysis of publicly available information."  "The discipline can also be called web intelligence or WEBINT."

Research Institute ("NCRI"),[2] could find out "exactly who was behind" the attack on the Capitol.   Riggleman promised Cheney that NCRI "could identify key drivers and participants in the deep-web radicalization pipeline."   In the *Breach*, Riggleman states that he "identified the three major pillars" for the "domestic terrorism investigation" to focus on: "(1) the government role and response; (2) the involvement of militant groups and the radicalization pipeline; and (3) foreign disinformation."   Riggleman claims that by using a "fusion-center approach"[3] that helped him "blend SIGINT and HUMINT",[4] he was able to spot the "major players who linked various groups" and track "various far-

---

[2]      Riggleman explains that NCRI is "within Rutgers University's Eagleton Institute of Politics."   As a "senior" technical advisor to the J6 Committee, Riggleman called upon his "former military and NSA colleagues" to get a sense of what he needed. Some of Riggleman's recruits worked on counterintelligence with a "whole host of secretive three-letter agencies."   "If there was indeed a conspiracy", it was essential to identify "subject matter experts needed to track it."   For "tracking social media data", Riggleman reached out to as-yet unidentified "researchers" at NCRI.   Riggleman chose "PATCtech" for telephony analysis and "AIG Partners" for OSINT.   According to Riggleman, AIG Partners regularly consults with "intelligence agencies."   AIG Partners reported on "what subjects of the investigation said, what they planned, and who they linked with online."   In the *Breach*, Riggleman refused to identify the names of any agents and employees of AIG Partners.   The identities of Riggleman's sources will be a subject of discovery in this action.

[3]      According to Riggleman, he learned the "fusion-center approach" as a contractor for the National Security Agency ("NSA").

[4]      In the *Breach*, Riggleman states that in the "intelligence world, we break down information into two main categories.   There's human intelligence, or HUMINT, which is gathered from human sources, including targets, informants, and allies.   Then there's signals intelligence, or SIGINT, which is all the information you can gather from electronics like radar or by tracking communications."   Riggleman claims he used "military grade intelligence" during his work for the J6 Committee. **Upon information and belief, Riggleman and/or members of the J6 Committee used SIGINT or communications intelligence to unlawfully gather information on 1AP and other "domestic terrorists" or obtained SIGINT from the FBI and/or NSA that the J6 Committee then used against U.S. citizens, including President Trump, Lieutenant General (Retired) Michael T. Flynn ("General Flynn"), and other high-level targets of the so-called "domestic terrorism investigation".**

right groups including Oath Keepers, Proud Boys, QAnon, anti-vaxxers, and neo-Nazis".

Working with "the NCRI team", Riggleman put together a "quick-turn report on the

attack" for Cheney.  Riggleman states that the rhetoric of "far-right" "militants", such as

1AP, eventually resulted in a "plan to converge on the Capitol."  According to

Riggleman, his "phone records analysis" ultimately showed a "thick web with extensive

lines of communications" between "Trump associates", Trump's "inner circle", and

militant groups like Oath Keepers, Proud Boys and 1AP.  In the *Breach*, Riggleman

claims that "call detail records and open-source intelligence" highlighted "how the

groups involved in the plan to overturn the election communicated and moved on the

Capitol."  Riggleman states that General Flynn led the "rioters who stormed the building"

on January 6, 2021 into "battle".  Riggleman reveals that his "teams" "built dossiers for

the [J6] investigative team with robust profiles".  AIG Partners "drafted deep-dive

dossiers" on all the "major players" involved in the violent attack.  Riggleman asserts that

"we definitely showed that the attack on the Capitol had clear command and control

elements … they worked toward a common goal: securing Trump a second term by any

means necessary … The maps my team made showed robust linkages among the militant

groups who were the driving force in the mob that stormed the Capitol … There was a

plan.  There was a vision.  And the lines all pointed straight up to President Trump."  As

Riggleman's work for the J6 Committee began, "the major questions involved the

militant groups who were part of the attack."  Throughout the work, "there were four

people who were extensively connected to all six clusters on 'The Monster.'  They were

in contact with militias and the highest levels of Trump's inner circle.  We saw them as

the key touch points: Bianca Gracia, Alex Jones, Kristin Davis, and Roger Stone."

According to Riggleman, Stone and Davis "brought together two of our key groups, the domestic violent extremists and the Trump associates … Alex Jones also had direct links to militants and the higher-level players in the political operation."[5]

6.      Hearst read the *Breach* before it published the Riggleman Piece. However, Hearst never "fact-checked" the Statements about 1AP.  Hearst intentionally violated its own journalistic standards, and, therefore, harbored serious doubt as to the veracity of the Riggleman Piece.  Hearst also deliberately ignored the well-known fact that 1AP had filed a lawsuit in New Hampshire on April 15, 2022 in which 1AP denied any role in the attack on the United States Capitol. *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 161 (1967) ("Where a publisher's departure from standards of press responsibility is severe enough to strip from him the constitutional protection our decision acknowledges, we think it entirely proper for the State to act not only for the protection of the individual injured but to safeguard all those similarly situated against like abuse").[6]

---

[5]      The *Breach* intentionally compromised the J6 Committee's investigation. On September 25, 2022, two days before Riggleman, Holt and MacMillan published the *Breach*, the J6 Committee directed the *Washington Post* to publish a story in which the Post reported that J6 Committee members and staffers were "shocked", "rankled" and "deeply disappointed" by Riggleman's unauthorized disclosures.  In the article, the J6 Committee tried to distant itself from its former "senior" technical advisor, and his leaks. [https://www.washingtonpost.com/politics/2022/09/25/ex-staffers-unauthorized-book-about-jan-6-committee-rankles-members/].  Hearst ignored the *Post* article.

[6]      In *Butts*, as in this case, "prior to publication the Saturday Evening Post had been notified both by Butts and his daughter that the material about to be printed was false.  Despite these warnings, and the fact that no member of the staff had ever even seen Burnett's crucial notes, no further efforts at investigation were undertaken prior to publication.  It might indeed be argued that this conduct would have sufficed, under proper instructions, to satisfy even the 'actual malice' standard of New York Times, the notice to the Saturday Evening Post being considered as furnishing the necessary 'mental element.'" 388 U.S. at 161 fn. 23.

7.     The Statements are materially false.   1AP is not a "domestic violent extremist".[7]   1AP is not a "militant group".   1AP did not engage in violence at the Capitol on January 6th.   1AP did not take part in the attack on United States Capitol on January 6th.   As Riggleman's "Monster" plainly demonstrates, 1AP was not and is not "connected" or "linked" to President Trump, his "advisors", his "inner circle" or anyone who stormed the Capitol on January 6, 2021.   Lewis and Luelsdorff had no communications with the so-called "key touch points" – Gracia, Jones, Davis, and Stone.  Comparing the false Statements to the truth, it is beyond peradventure the Statements are materially false. [*Flynn v. Cable News Network, Inc.*, 2022 WL 3334716, at * 5 (S.D.N.Y. 2022) ("given the extreme negative connotations of being a QAnon follower, the Flynns have adequately alleged that being labeled a QAnon follower would have a different effect on the mind of a viewer than the pleaded truth."); *Nunes v. W.P. Company*, 2021 WL 3550896, at * 4 (D. D.C. 2021) ("A reasonable juror could conclude that there is a material difference between stating that Nunes had made a claim supported by evidence (that the Obama administration had undertaken intelligence activities related to individuals involved in the Trump campaign) and stating that Nunes had made a baseless claim (that the Obama administration had wiretapped Trump Tower).   A

---

[7]     The FBI and the Department of Homeland Security ("DHS"), "use the term Domestic Violent Extremist (DVE) to describe an individual based and operating primarily within the territorial jurisdiction of the United States who seeks to further their ideological goals wholly or in part through unlawful acts of force or violence." DHS-FBI, *Domestic Terrorism: Definitions, Terminology, and Methodology*, p. 2 (November 2020) ("DHS … uses the term 'domestic terrorist,' … interchangeably with 'domestic violent extremist'"); https://www.dhs.gov/sites/default/files/publications/21_0301_odni_unclass-summary-of-dve-assessment-17_march-final_508.pdf ("the IC defines a DVE as an individual based and operating primarily in the United States without direction or inspiration from a foreign terrorist group or other foreign power and who seeks to further political or social goals wholly or in part through unlawful acts of force or violence").

reasonable juror could therefore conclude that the article was materially false because it stated that Nunes had made such a baseless claim (when he had not).”); *see also Bustos v. A&E Networks*, 646 F.3d 762, 767 (10th Cir. 2011) (Gorsuch, J.) (“Comparing the challenged defamatory statement (membership in the Aryan Brotherhood) to the truth (conspiring with and aiding and abetting the Aryan Brotherhood), we cannot see how any juror could find the difference to be a material one—that is, likely to cause a reasonable member of the general public to think significantly less favorably of Mr. Bustos”)].

8.    The Statements are defamatory per se. [*Flynn v. Cable News Network, Inc.*, 2021 WL 5964129, at * 4 (S.D.N.Y. Dec. 16, 2021) (“[F]alsely implying a connection to a violent extremist group can be defamatory.”); *see id. Zimmerman v. Buttigieg*, 521 F.Supp.3d 1197, 1214 (M.D. Fla. 2021) (“defamation *per se* is not confined to statements that someone committed a crime, as statements that tend to subject a person to hatred, distrust, ridicule, contempt or disgrace can suffice.   Certainly, a statement that attributes racist and white supremacist attributes to someone could subject that person to such harm.”) (citation omitted); *Sirer v. Aksoy*, 2021 WL 4952610, at * 4 (S.D. Fla. 2021) (“in the Complaint, Plaintiff alleges that Defendant posted a video on his YouTube channel accusing Plaintiff of being a member of an organization designated as a terrorist organization … Plaintiff alleges that his reputation has been harmed by Defendant’s statements, and that they pose a threat to Plaintiff’s and his family’s safety. Plaintiff need not allege more.”) (citation omitted); *Coker v. Barr*, 2020 WL 9812034, at * 8 (D. Colo. 2020) (“it is hard to imagine a greater stigma than being associated with terrorism in our post-9/11 world.”)].

9.     An accumulation of facts and evidence demonstrates that Riggleman, Hearst, Holt and MacMillan published the Statements with knowledge of falsity or reckless disregard for the truth.  Defendants knew from their review of public records, including the FBI's website and the George Washington University Program on Extremism, that over 800 people faced federal charges related to the attack on the United States Capitol, but that neither 1AP nor *any* of its agents or employees had *ever* been charged with *any* crime relating to the events of January 6.  Defendants also had specific "intelligence" ("deep-dive dossiers" compiled by AIG Partners) on 1AP, Lewis, Philip Luelsdorff ("Luelsdorff") and other employees of 1AP.  These intelligence "dossiers" demonstrated that 1AP's security professionals, including Lewis and Luelsdorff, were decorated and honorably discharged veterans, retired police officers and others, with no criminal histories.  Given 1AP's stature and the statute of its members and the fact that they were fully and thoroughly investigated and never charged with any crime related to the "attack" on January 6, 2021, the Statements are inherently improbable.  The inherent improbability of the Statements is prima facie evidence of Defendants' reckless disregard for the truth. [*St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("Professions of good faith will be unlikely to prove persuasive, for example, … when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation."); *US Dominion, Inc. v. Powell*, 554 F.Supp.3d 42, 63 (D. D.C. 2021) ("a reasonable juror could conclude that the existence of a vast international conspiracy that is ignored by the government but proven by a spreadsheet on an internet blog is so inherently improbable that only a reckless man would believe it."); *Stern v. Cosby*, 645 F.Supp.2d 258, 279 (S.D.N.Y. 2009) ("printing a claim that Birkhead and Stern had sex

would be a way to make it to the top of the bestseller list, and a reasonable jury could find that Cosby ignored the inherently improbable nature of the Statement in her zeal to write a blockbuster book")].  In truth, the events described in the *Breach* and Riggleman Piece as they relate to 1AP never happened.   Riggleman, Hearst, Holt and MacMillan fabricated facts and falsely attributed actions to 1AP.  Defendants falsely implicated 1AP in an insurrectionist plot.  Defendants knew from the J6 Committee's "military grade intelligence", "dossiers" and "link maps" that 1AP had no connections to any alleged insurrectionist or the violent attack. [*St. Amant*, 390 U.S. at 732 ("Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant [or] is the product of his imagination")].  In the *Breach* and the Riggleman Piece, Defendants embroiled 1AP in their preconceived agenda to get President Trump. Sadly, even an "intelligence" officer knows that the mere fact of phone calls and text messages proves nothing.  **Two plus two does not equal 45**.  Defendants brazenly republished the false and defamatory Statements about 1AP even after they were notified that 1AP contended in a lengthy letter to the J6 Committee and in a lawsuit that the Statements were false and defamatory.[8]  This is evidence of actual malice. [*See, e.g., Nunes v. Lizza*, 12 F. 4th 890, 901 (8th Cir. 2021) ("'Republication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard.'")].  Finally, as the *Breach* demonstrates, Riggleman harbors extreme spite and ill-will towards 1AP and others (including

---

[8]    By April 14, 2022, it was a matter of public record that 1AP expressly and emphatically denied any role or participation in the attack on the United States Capitol. [https://thefederalist.com/2022/07/08/exclusive-1st-amendment-praetorian-goes-after-jan-6-committee-for-mccarthy-esque-defamation-tactics/].  Hearst, Holt and MacMillan's editors fact-checked and reviewed the public record ahead of publication.  Defendants deliberately evaded the truth and published falsehoods with reckless disregard.

President Trump and General Flynn).  Riggleman's malice is so thick that he even states that General Flynn led the insurrectionists who stormed the Capitol into "battle". Riggleman is eager to attribute crimes, violence and extremism to 1AP and others in order to inflict harm.  This provides further evidence of actual malice. [*Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 186 (2nd Cir. 2000) ("Plaintiff introduced sufficient circumstantial evidence to establish clearly and convincingly that defendant Pelayo entertained serious doubts about the truth of the headline 'US judge finds Celle 'negligent.' This conclusion is based in part on evidence indicating ill will and personal animosity between Celle and Pelayo at the time of publication"); *ExpertConnect, LLC v. Fowler*, 2020 WL 3961004, at * 3 (S.D.N.Y. 2020) (plaintiff alleged that the defendants "'engaged in a concerted effort to deliberately disparage the business reputations of Fowler, Parmar, and Strafluence with false statements' that they had committed a serious crime and were under investigation.  These statements were made 'with full knowledge of their falsity' because '[t]here has never been any criminal action commenced against Fowler or Parmar, no investigation of any sort and, to be sure, no allegations of criminal conduct.'")].

10.     In order to exacerbate the damage caused by the Riggleman Piece, Hearst republished the false and defamatory Statements multiple times to Hearst's 428,900+ Twitter followers:

> https://twitter.com/esquire/status/1574759975548866560;
> https://twitter.com/esquire/status/1575130766752813056.

11.     For his part, Riggleman made the rounds of various far left-wing Democratic Party trumpets promoting the *Breach*:

https://twitter.com/DeadlineWH/status/1575616492397281280;
https://twitter.com/katiephangshow/status/1575593065842061312;
https://twitter.com/ABCNewsLive/status/1574918779104010240;
https://twitter.com/hunterw/status/1574893271788265478;
https://twitter.com/KatyOnMSNBC/status/1574857843588665351;
https://twitter.com/JesseRodriguez/status/1574506104146501632;
https://twitter.com/TheSundayShow/status/1579090551848173568;
https://twitter.com/thereidout/status/1580315802867093504.

In spite of receiving notice from 1AP that the Statements are false and defamatory, Riggleman, Holt and MacMillan are actively promoting the *Breach*. The *Breach* is on sale at book stores in Charlottesville and elsewhere in the Western District of Virginia. Riggleman has even encouraged visitors to Silverback Spirits, his distillery in Nelson County, to contact Holt with inquiries about his book:

https://twitter.com/RepRiggleman/status/1575222799446134784;
https://twitter.com/RepRiggleman/status/1574914577103552512;
https://twitter.com/RepRiggleman/status/1579721321050607616;
https://twitter.com/MacmillanAudio/status/1574866282268205062;
https://www.sbdistillery.com/connect-1.

12. Third-parties, oblivious to the false Statements and defamatory implications in the *Breach* and Riggleman Piece, have enthusiastically republished the Riggleman Piece, mistakenly calling it a "rare glimpse of state-of-the-art data analysis and intelligence work done for the January 6 Committee" and a "terrific serial" by Hearst! [https://twitter.com/slross58/status/1575146881390465026].

13. Defendants' false Statements, defamatory implications and insulting words exposed 1AP to universal public scorn, ridicule and contempt, and severely prejudiced 1AP in its employment as private security detail, causing substantial professional and personal loss. The Statements are of or concerning 1AP. The Statements convey a defamatory meaning, including that 1AP took part in the January 6 attack on the United States Capitol, engaged in domestic terrorism, insurrection,

committed Federal crimes, including conspiracy to commit election fraud, aided and abetted the commission of Federal crimes, or otherwise engaged or participated in criminal, violent, dishonest, deceptive, immoral, unethical, unprofessional or improper conduct.

## II.  PARTIES

14.     1AP is a Delaware corporation with a principal place of business in Dallas, Texas.

15.     Riggleman is a citizen of Virginia.  He lives and owns property and has business interests in Nelson County, Virginia.  Riggleman was Virginia's 5th District Congressman.  In addition to the *Breach*, Riggleman is the author of a book called *Bigfoot…Its Complicated*.  Riggleman sells his books (Kindle, Audiobook, Hardcover and Mass Market Paperback) on Amazon.

16.     Hearst is a Delaware corporation.  Its headquarters and principal place of business is New York.  Hearst publishes *Esquire* magazine.  Hearst is a unit of Hearst Corporation, a global media, information and services company.  Hearst has hundreds of thousands, perhaps millions, of print and digital subscribers, viewers and social media followers who live and work in Virginia.  Hearst has sold millions of copies of *Esquire* and its other 259 magazine editions to Virginians.

17.     Holt is an American imprint formed and based in New York that publishes books for sale in Virginia and elsewhere.  Holt published the *Breach*, and contracted for its sale in Virginia.  Holt and MacMillan authorized Hearst to republish the Riggleman Piece.

18.     MacMillan is a British publishing group.   MacMillan owns Holt. MacMillan advertises, distributes and sells the *Breach* in Virginia and elsewhere, both in print and via audiobooks.

19.     Upon information and belief, Holt and MacMillan paid Riggleman a $500,000 advance to write the *Breach*.  Riggleman, Holt and MacMillan have contracted to share the expected profits from sales of the book.

### III.   JURISDICTION AND VENUE

20.     The United States District Court for the Western District of Virginia has subject matter jurisdiction over this action pursuant to Title 28 U.S.C. § 1332 (Diversity). The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

21.     Defendants are each at home in Virginia, and are subject to the Court's general personal jurisdiction and specific personal jurisdiction.

22.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

23.     On September 30, 2022, 1AP served Defendants with written notice advising Defendants that the Statements were false and defamatory and demanding that the Statements be retracted, removed from the Internet, and that Defendants cease and desist publishing any further versions of the *Breach* that contain the false and defamatory Statements.  Defendants refuse to retract.  They continue to sell the book in spite of the continuing damage to 1AP's business and reputation.

### COUNT I – DEFAMATION

24.     1AP restates paragraphs 1 through 23 of this Complaint, and incorporates them herein by reference.

25.     1AP is a private company.  It is not a public figure.

26.     Riggleman, Hearst, Holt and MacMillan published the false Statements without privilege of any kind.  To date, the J6 Committee has not published a report.  The *Breach* is an "untold" story by a person with "limited knowledge" of the J6 Committee's investigation.  The Statements are neither fair nor accurate nor substantially correct accounts of proceedings or reports of the J6 Committee or its alleged "domestic terrorism investigation".  In fact, the Statements are pure fiction unsupported by any of Riggleman's so-called "dossiers" or "link" maps or "military grade intelligence".  In the *Breach* and Riggleman Piece, Defendants added information about 1AP that was contradicted by the data, and juxtaposed 1AP with "domestic violent extremists" in a way that is unsupported, unjustified and plainly untrue and misleading.  The J6 Committee has no evidence that 1AP engaged in violence and/or took part in the attack on the United States Capitol.   Hearst, Holt and MacMillan plainly adopted Riggleman's false Statements as their own.  Defendants fabricated the sensational narrative to sell books and magazines.  They circulated the *Breach* and the Riggleman Piece broadly with the goal of damaging 1AP's reputation.  [*See Tomblin v. WCHS-TV8*, 2011 WL 1789770, at * 5 (4th Cir. 2011) (unpublished) ("on the question of whether WCHS-TV8 deliberately or recklessly conveyed a false message to sensationalize the news and thus to provide factual support for a finding of malice, there are disputed facts")].  1AP was not involved in any way in the recruitment, planning or execution of the attack on the Capitol.  1AP did not plan, undertake, conspire with anyone, or aid and abet in domestic terrorism, insurrection or sedition.  Contrary to Defendants' misrepresentations: (a) 1AP is not and never was radical, extremist, militant or violent, (b) 1AP never coordinated any action

with any DVE groups; (c) 1AP never planned or schemed with Oath Keepers, Proud Boys, Stop the Steal, or any other group to do anything.  The Statements cast aspersion on 1AP's honesty, prestige and standing in its field of business.  The Statements, taken as a whole, are more damaging to 1AP's reputation than a truthful publication would have been.  The Statements are demonstrably false, unfair and inaccurate.  The Statements are not substantially true.

27.    Defendants lacked reasonable grounds for a belief in the truth of the Statements, and acted negligently in failing to determine the true facts.  Defendants lumped 1AP together with other DVEs.  Given the certain opprobrium and harm that Defendants knew would result to 1AP from being associated with the violent attack on the Capitol on January 6, 2021, Defendants were grossly negligent in publishing the Statements about 1AP.  Defendants failed to exercise reasonable care, abandoned ethical duties to report the truth and minimize harm, and, in their desire to publish a scandalous story about 1AP, violated the codes of ethics and journalistic integrity, customs and standards in the industry applicable to the media.

28.    The Statements constitute express defamation published with actual malice.

29.    The publication and republication of the false Statements caused 1AP to suffer and incur special damages: (a) 1AP experienced measurable and ongoing loss of income and business and inability to gain prospective business; (b) 1AP has become uninsurable as insurance brokers do not want to take on the enterprise and reputational (political) risk of being associated with "insurrectionists"; (c) donations to 1AP were canceled because of the false Statements and implications; (d) donations to 1AP through

other channels have severely decreased because of the false Statements and implications; (e) venue owners now refuse to rent their spaces to event organizers who work with 1AP because of the climate Defendants created; and (f) the false Statements caused 1AP to be investigated by the J6 Committee, forcing 1AP to incur significant legal and other expenses to defend the lies and defamatory implications.  1AP is now basically insolvent and completely destroyed.  In addition to special damages, 1AP suffered actual injuries, including injury to reputation (past and future).

30.     As a direct result of Defendants' defamation, 1AP suffered damage and loss, including, but not limited to, special damage, loss of income, lost future earnings and diminished earning capacity, injury to standing, good will and reputation, costs and other out-of-pocket expenses, in the sum of $50,000,000.00 or such greater amount as is determined by the Jury.

## COUNT II – <u>DEFAMATION BY IMPLICATION</u>

31.     1AP restates paragraphs 1 through 30 of this Complaint, and incorporate them herein by reference.

32.     The strong defamatory gist and false implication of the Statements is that 1AP participated in or conspired and colluded with others to plan and undertake the violent seditious attack upon the United States Capitol on January 6, 2021.   The Statements imply that 1AP engaged in conduct that is criminal, dishonest, deceitful, immoral, unethical, and that, at the very least, they knowingly aided, abetted and are accessories to Federal crimes.

33.     Defendants carefully chose their words and purposefully misrepresented facts.  In the Statements, they juxtaposed a series of facts so as to imply a defamatory

connection between them.  They used a "Monster" "link" map to convey the false impression that "intelligence" reveals that 1AP and other "domestic terrorists" were "connected" and engaged in a coordinated effort to attack the Capitol on January 6, 2021. The "link" map is a gigantic non sequitur.  Defendants intentionally omitted facts, including that Lewis and Luelsdorff had no contact with the "key touch points", in a way that conveyed a false meaning and that rendered the challenged Statements defamatory. Defendants intended and endorsed the defamatory implication by, *inter alia*, using incendiary and suggestive phrases and discussions of 1AP's involvement in criminal activity on January 6, 2021, including the violence and attack on the Capitol building. The manner in which Defendants presented the discussion demonstrates that Defendants intended or endorsed the defamatory implication.

34.     Defendants' Statements constitute defamation by implication.

35.     As a direct result of Defendants' defamation by implication, 1AP suffered damage and loss, including, but not limited to, special damage, loss of income, lost future earnings and diminished earning capacity, injury to standing, good will and reputation, costs and other out-of-pocket expenses, in the sum of $50,000,000.00 or such greater amount as is determined by the Jury.

## COUNT III – <u>INSULTING WORDS</u>

36.     1AP restates paragraphs 1 through 35 of this Complaint, and incorporates them herein by reference.

37.     Defendants' insulting words, in the context and under the circumstances in which they were written, tend to violence and breach of the peace.  1AP was humiliated, disgusted, angered and provoked by the insulting words.

38.     Defendants' words, including the direct and powerful accusation that 1AP is a "domestic violent extremist" and that 1AP "engaged in violence" and took part in the "attack" on the United States Capitol, are fighting words, which are actionable under § 8.01-45 of the Code.

39.     As a direct result of Defendants' insulting words, 1AP suffered damage and loss, including, but not limited to, special damage, loss of income, lost future earnings and diminished earning capacity, injury to standing, good will and reputation, costs and other out-of-pocket expenses, in the sum of $50,000,000.00 or such greater amount as is determined by the Jury.

## COUNT IV – <u>PERMANENT INJUNCTION</u>

40.     1AP restates paragraphs 1 through 39 of this Complaint, and incorporates them herein by reference.

41.     In the *Breach* and Riggleman Piece, Defendants disseminated false and defamatory Statements that caused irreparable harm to 1AP.  1AP is unable to repair its reputation with the persons that Defendants unilaterally contacted, especially book purchasers and the millions on the Internet and Twitter whose identities are unknown.

42.     Monetary damages will not provide an adequate remedy for 1AP because, in the event Defendants continue to defame 1AP, 1AP would be required to bring a succession of lawsuits to deter Defendants from continuing to defame 1AP.  Monetary damages may not effectively deter "judgment proof" or even wealthy defendants, like Hearst.

43.     In light of the balance of the hardships between 1AP and Defendants, a remedy in equity is warranted because Defendants remain able to express themselves in a manner that does not repeat the Statements that have been determined to be defamatory.

44.     Public interest would be served by an injunction narrowly tailored to prohibit repetition of the Statements that qualify as defamatory under Virginia law because such an injunction does not threaten to silence Defendants completely.

45.     Because Defendants have engaged in repeated acts of defamation *per se*, using multiple media (including print, Internet and social media), and the defamatory conduct at issue threatens to continue in the future, Defendants should be permanently restrained and enjoined from publishing the defamatory Statements to recipients within the United States by mail, email, or other social media.  Riggleman, Holt and MacMillan should be permanently enjoined from selling any further copies of the *Breach* that contain the false and defamatory Statements.  Hearst should be ordered to remove the Riggleman Piece from its website and deactivate all online and social media hyperlinks.

1AP alleges the foregoing based upon personal knowledge, public statements of others, and records in its possession.  1AP believes that substantial additional evidentiary support, which is in the exclusive possession of Defendants and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

1AP reserves its right to amend this Complaint upon discovery of additional instances of Defendant's wrongdoing.

21

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, 1AP respectfully request the Court to enter Judgment against the Defendants, jointly and severally, as follows:

A.      Compensatory damages in the sum of $50,000,000.00;

B.      Punitive damages in the sum or $350,000.00 or the maximum amount allowed by law;

C.      Permanent injunctive relief as prayed for above;

D.      Prejudgment interest on the principal sum awarded by the Jury at the maximum rate allowed by law from September 27, 2022 until Judgment is entered;

E.      Postjudgment interest;

F.      Such other relief as is just and proper.


**TRIAL BY JURY IS DEMANDED**


DATED:          October 19, 2022


1ST AMENDMENT PRAETORIAN


By:___ */s/ Steven S. Biss*_____
                Steven S. Biss (VSB # 32972)
                300 West Main Street, Suite 102
                Charlottesville, Virginia 22903
                Telephone:  (804) 501-8272
                Facsimile:  (202) 318-4098
                Email:  stevenbiss@earthlink.net

                *Counsel for the Plaintiff*